**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL HINES, | ) | CASE NO. 5:17CV2332 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Daniel Hines, ("Plaintiff" or "Hines"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

In June 2014, Hines filed an application for POD and DIB, alleging a disability onset date of May 30, 2014 and claiming he was disabled due to lupus, cystic lung disease, emphysema, chronic kidney disease, low thyroid, low testosterone, high blood pressure, fatigue, forgetfulness, and depression.  (Transcript ("Tr.") 60, 250.)  The applications were denied initially and upon reconsideration, and Hines requested a hearing before an administrative law judge ("ALJ").  (Tr. 60, 164-167, 171-177, 178.)

On July 7, 2016, an ALJ held a hearing, during which Hines, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 78-103.)  On July 25, 2016, the ALJ issued a written decision finding Hines was not disabled.  (Tr. 60-77.)  The ALJ's decision became final on September 6, 2017, when the Appeals Council declined further review.  (Tr. 1-7.)

On November 7, 2017, Hines filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 18, 19.)  Hines asserts the following assignments of error:

    (1)    The ALJ erred in evaluating Plaintiff's impairments under Listing 14.02.

    (2)    The ALJ erred in evaluating the opinions of Plaintiff's treating physicians.

(Doc. No. 17.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Hines was born in December 1963 and was fifty-two (52) years-old at the time of his administrative hearing, making him "an individual closely approaching advanced age" under social security regulations.  (Tr. 71.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has at least a high school education and is able to communicate in English.  (*Id.*)  He has past relevant

work as a supervisor– injection molding (medium, skilled).  (Tr. 71.)

**B.      Relevant Medical Evidence[2]**

The record reflects Hines began treatment with rheumatologist Rochelle Rosian, M.D., in June 2009 for evaluation of inflammatory polyarthritis and lupus.  (Tr. 348.)  On June 12, 2013, Hines presented to Dr. Rosian with complaints of pain and stiffness in his hands, feet, knees, elbows and shoulders.  (Tr. 348-349.)  He also reported joint swelling in his fingers, fatigue, "fair to low" energy, and difficulty sleeping.  (Tr. 350.)  Dr. Rosian noted a history of fever, myalgia, headache, repeated respiratory illness (including bronchitis and pneumonia), and sensitivity to sunlight (hives).  (Tr. 348.)  She also indicated a previous diagnosis of "lupus lung."  (Tr. 349.)  Examination revealed shoulder stiffness; tenderness in Hines' bilateral elbows; swelling, tenderness, and warmth in his bilateral wrists; tenderness and effusion in his bilateral knees; and swelling and tenderness in his bilateral fingers.  (Tr. 350.)  Dr. Rosian diagnosed lupus, bilateral knee pain, vitamin D deficiency, hypertension, and glomerulonephritis.  (*Id.*)

Hines returned to Dr. Rosian on November 12, 2013.  (Tr. 354-360.)  He reported "having so much trouble with low energy and fatigue."  (Tr. 354.)  Hines also complained of constant joint pain in his hands, feet, knees, elbows and shoulders, which he rated a 3 on a scale of 10.  (Tr. 355, 358.)  At this time, Hines was still working 9 hour shifts managing a crew of 20 in a plastics factory.  (Tr. 354.)  However, he stated he "naps all weekend and is not able to get anything done on weekends."  (*Id.*)  Dr. Rosian's diagnoses and examination findings were the same as Hines' previous visit.  (Tr. 356.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On January 13, 2014, Hines presented to primary care physician Andrew McIntosh, M.D.[3] (Tr. 463-464.) Hines complained of cough, sinus congestion, and shortness of breath. (*Id.*) Dr. McIntosh indicated he was "worried re [increased] lupus lung." (*Id.*) Examination revealed "coarse" breathing sounds and "diffuse wheezes throughout." (*Id.*) He ordered a chest x-ray, which Hines underwent that date. (Tr. 446.) This imaging revealed "no active process." (*Id.*)

Hines returned to Dr. McIntosh on January 27, 2014 with complaints of continued chest congestion and sore throat. (Tr. 465, 600.) He had just completed a prednisone taper and was scheduled to see his pulmonologist the following month. (*Id.*) Examination revealed "expiratory wheezing throughout," as well as thrush. (*Id.*) Several months later, on March 27, 2014, Hines continued to complain of cough, congestion, wheezing, nasal drainage, and fatigue. (Tr. 467-468, 615.) Certified Nurse Practitioner S. Jill Sommers, C.N.P., noted a frequent dry cough on examination. (Tr. 468.) She diagnosed acute sinusitis, ADHD, hypertension, lupus (or "SLE"), and GERD; and advised Hines to use his breathing aerosols regularly and as needed. (*Id.*)

On May 9, 2014, Hines presented to a certified nurse practitioner in Dr. Rosian's office, Deshawn Jones, C.N.P., for an urgent visit related to fatigue, joint pain, and joint swelling for the previous two weeks. (Tr. 361-367.) He complained of pain in his knees, ankles, hips, shoulders, elbows, and hands, which he rated a 4 on a scale of 10. (Tr. 361.) Hines also reported fatigue, joint swelling in his hands, and rashes when exposed to sunlight. (Tr. 361-362.) On examination, Hines' lungs were clear and his gait was normal. (Tr. 362.) Nurse Jones did find

---

[3] The record reflects Hines began treatment with Dr. McIntosh in April 2002. (Tr. 454.)

4

tenderness and "minimal" swelling in his metacarpophalangeal joints ("MCPs").[4]  (Tr. 362.)  She assessed a lupus flare, ordered a prednisone taper, and strongly encouraged Hines to follow up with his pulmonologist.  (Tr. 363.)

On June 2, 2014, Hines returned to Dr. McIntosh with complaints of extreme fatigue, frequent naps, forgetfulness, "losing time," and "losing balance (hasn't fallen) usually going up/down stairs."  (Tr. 469-470.)  Hines reported he had stopped working and was on short-term disability.  (*Id*.)  He stated he was easily irritable and had difficulty making decisions.  (*Id*.)  Hines also complained of chronic shortness of breath with "minimal activity." (*Id*.)  Although Dr. McIntosh's handwritten treatment notes are somewhat difficult to decipher, it appears examination findings were largely normal.  (*Id*.)  He diagnosed lupus, "CTD" (i.e., connective tissue disorder), arthralgia, "lupus lungs," fatigue, day time somnolence, and ADHD.  (*Id*.)  Dr. McIntosh also encouraged Hines to see his pulmonologist.  (*Id*.)  Two weeks later, on June 25, 2014, Hines returned to Dr. McIntosh for a cortisone shot in his foot due to a neuroma.  (Tr. 471-472.)

Hines returned to Dr. McIntosh on August 14, 2014.  (Tr. 473-476.)  He reported he had "been able to take pain meds and exercise on treadmill some," although he still had some shortness of breath.  (Tr. 473-474.)  Examination findings appear to have been largely normal, although Dr. McIntosh noted Hines' testosterone levels were "really high." (Tr. 474-474, 476.)  He diagnosed lupus, lupus lung, ADD, hypertension, and GERD.  (Tr. 474.)

On September 16, 2014, Hines presented to Dr. Rosian for follow-up of his inflammatory

---

[4] "The metacarpophalangeal joints (MCP) refer to the joints between the metacarpal bones and the phalanges of the fingers."  *See* https://www.ncbi.nlm.nih.gov.

polyarthritis and lupus.  (Tr. 479-484.)  He reported "he has stopped working, he put in for disability, he is losing weight and joints and energy are better."  (Tr. 479.)  On examination, Dr. Rosian noted clear lungs, normal gait and sensation, and tenderness with minimal swelling in Hines' MCP joints.  (Tr. 481.)  She characterized his joints as "steady," and assessed lupus, vitamin D deficiency, and hypertension.  (*Id.*)

On November 3, 2014, Hines returned to Dr. McIntosh.  (Tr. 607-608.)  He reported he had "starting working out more, actually using treadmill, some exercise," but noted he still needed his nebulizer.  (*Id.*)  Hines also stated he would like to work but was not able to due to his fatigue and pain.  (*Id.*)  Examination findings appear to have been normal, aside from a rash on his hands.  (*Id.*)  Dr. McIntosh ordered blood work.  (*Id.*)

On November 24, 2014, Dr. Rosian completed a "Lupus (SLE) Residual Functional Capacity Questionnaire."  (Tr. 498-510.)  She noted she had treated Hines since June 2009, two to four times per year depending on the severity of his symptoms.  (Tr. 498.)  When asked to identify clinical findings, symptoms, and objective signs of Hines' impairments, Dr. Rosian noted malar rash (over the cheeks); photosensitivity; non-erosive arthritis in his hands, feet, ankles, knees, fingers, and wrists (including swelling, warmth, and tenderness); positive ANA; severe fatigue, severe malaise, muscle weakness, and poor sleep.  (Tr. 498-499.)  Dr. Rosian also identified shortness of breath and COPD.  (Tr. 500.)  She characterized his prognosis as fair. (*Id.*)

Dr. Rosian assessed the following physical functional limitations:

- Hines' experience of symptoms was severe enough to often interfere with his attention and concentration;

- He could tolerate moderate work stress;

6

- He could walk one city block without rest;

- He could sit for 30 to 45 minutes at one time (e.g., before needing to get up, etc.) and for a total of less than 2 hours in an 8 hour workday;

- He could stand for 30 minutes at one time (e.g., before needing to sit down, walk around, etc.) and stand/walk for a total of less than 2 hours in an 8 hour workday;

- He would need a job that permits shifting positions at will from sitting, standing, or walking;

- He would need to take unscheduled breaks every 3 hours for 15 minutes before returning to work;

- He could lift and carry 10 to 20 pounds occasionally[5] but never 50 pounds;

- He could occasionally twist and stoop, but never crouch or climb ladders or stairs;

- He could engage in reaching, handling, and fingering with his bilateral hands for 5% of an 8 hour workday;

- He should avoid all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, and solvents/cleaners;

- He should avoid even moderate exposure to extreme cold, extreme heat, high humidity, and perfumes;

- He would be likely to be absent from work about four days per month as a result of his impairments or treatment.

(Tr. 501-503.)  Finally, Dr. Rosian stated that: "Due to [the] increased fatigue, joint pain and swelling he has been experiencing, it is difficult to determine how he could be dependable for full-time work."  (Tr. 504.)

On December 3, 2014, Dr. McIntosh completed a Medical Source Statement regarding

---

[5] The form defines the term "occasionally" as meaning 6% to 33% of an 8 hour workday. (Tr. 502.)

Hines' "Ability to Do Work-Related Activities (Physical)."  (Tr. 577-582.)  He found Hines had

the following physical functional limitations:

- He could occasionally[6] lift and carry up to 10 pounds; occasionally lift 11 to 20 pounds; never carry 11 to 20 pounds; and never lift or carry more than 20 pounds;

- He could sit for 2 hours at one time without interruption and for a total of 2 hours in an 8 hour workday;

- He could stand for 1 hour at one time without interruption and for a total of 1 hour in an 8 hour workday;

- He could walk for 1 hour at one time without interruption and for a total of 1 hour in an 8 hour workday;

- He does not require the use of a cane, and can ambulate 129.5 feet without the use of a cane;

- He cannot walk a block at a reasonable pace on rough or uneven surfaces;

- He can never reach overhead bilaterally; occasionally reach in all other directions bilaterally; occasionally handle, finger, and feel bilaterally; and never push/pull;

- He can occasionally operate foot controls with his right foot but never with his left foot;

- He can never crawl, or climb stairs, ramps, ladders or scaffolds;

- He can occasionally balance, stoop, kneel, and crouch;

- He can never be exposed to unprotected heights, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations;

- He can occasionally be exposed to moving mechanical parts;

- He can frequently be exposed to humidity, wetness, and operating a motor

---

[6] The form defined the term "occasionally" as meaning "very little to one-third of the time."  (Tr. 577.) The term frequently is defined as meaning "one-third to two-thirds of the time," and the term "continuously" means "more than two-thirds of the time." (*Id.*)

8

vehicle;

- He can tolerate a moderate amount of noise; and

- On average, he would likely be absent from work more than four days per
  month due to his impairments or treatment.

(Tr. 577-582.)  When asked to identify particular medical or clinical findings supporting his

assessments, Dr. McIntosh noted generally that "lupus causes diffuse muscle pain and weakness,

joint swelling anywhere in the body, centrilobular emphysema decreasing lung function, fatigue

and rashes."  (Tr. 578.)  With regard to Hines' manipulative limitations in particular, Dr.

McIntosh identified clinical findings of synovitis, subchondrial sclerosis, decreased range of

motion, and pain in all fingers of both hands except his left fifth digit.  (Tr. 579.)  With regard to

Hines' use of his feet, Dr. McIntosh identified clinical findings of "arthralgia, symmetric

polyarthropathy, pain, [illegible] reticularis, and bunions cause pain in patient, as well as

metatarsalgia and morton's neuromata."  (*Id*.)  With regard to Hines' postural limitations, Dr.

McIntosh identified the following findings supporting his assessment: "Knees hurt bad and leg

muscles hurt, too."  (Tr. 580.)  Finally, Dr. McIntosh remarked that "fatigue, pain, and dyspnea

[i.e., shortness of breath] limit exertion as well as mental concentration."  (Tr. 582.)

On December 9, 2014, Hines presented to Dr. McIntosh with complaints of increased

anxiety. (Tr. 670.)  Dr. McIntosh prescribed Klonopin. (*Id*.)  Several weeks later, on December

17, 2014, Hines complained of pain in his right hip, low back, and left shoulder.  (Tr. 671.)  He

had been taking prednisone for knee pain, and reported some improvement.  (*Id*.)  Hines'

indicated he had started working out but had "not done much" for the previous three weeks due

to his shoulder pain.  (*Id.*)  He also reported anger and mood issues, noting he had been "applying

great effort of rational thought to control his anger/irrational thoughts."  (Tr. 671-672.)  Dr.

9

McIntosh diagnosed adjustment disorder, anxiety, lupus lung, and rotator cuff strain.  (Tr. 672.)

On January 2, 2015, Hines presented to Dr. McIntosh for an injection in his left shoulder.  (Tr. 673.)  The following week, he complained of right hip pain.  (Tr. 674.)

On February 3, 2015, Hines returned to pulmonologist Charles Fuenning, M.D., after a three year absence.  (Tr. 647-650.)  He reported he was sick "about four months last winter but between work and illness was unable to get here for a follow up."  (Tr. 647.)  Hines complained of shortness of breath with exertion, chest tightness, and wheeze with exertion.  (*Id*.)  On respiratory examination, Dr. Fuenning noted as follows: "normal, without wheezes, clear to auscultation bilaterally, but on forced expiration, has prolonged wheeze and end expir[atory] wheeze."  (Tr. 648.)  He diagnosed asthma, pneumatocele of lungs, lupus, dyspnea, rhinitis, history of tobacco use, and gastroesophageal reflux disease ("GERD").  (*Id*.)  Dr. Fuenning prescribed Spiriva and Montelukast and ordered lab work, a CT of Hines' chest, and pulmonary function testing.  (Tr. 648-649.)

Hines returned to Dr. McIntosh twice in March 2015, with complaints of nasal congestion, cough, sinus drainage, urinary issues, and prostrate pain.  (Tr. 713, 715-716.)  Dr. McIntosh noted continued concerns regarding lupus lung and proteinuria.  (Tr. 716.)  He prescribed Trazodone and continued Hines on Adderall and Klonopin.  (Tr. 715-716.)

On April 8, 2015, Hines underwent a CT of his chest which revealed (1) no evidence of pulmonary embolism or aortic dissection; (2) bilateral dependent subsegmental atelectasis; (3) scattered emphysematous changes; and (4) probable right hepatic cyst.  (Tr. 710.)  On that same date, he also underwent pulmonary function testing, which showed (1) small airways obstruction; (2) no desaturation with moderate exertion; (3) no pulmonary limitation to exertion; and (4)

10

significant cardiac reserve at peak submaximal exertion.  (Tr. 708, 709.)

Hines returned to Dr. Fuenning on April 22, 2015.  (Tr. 775-777.)  He reported his "breathing has not been too bad," noting the Spiriva "does help."  (Tr. 775.)  On respiratory examination, Dr. Fuenning again found Hines' lungs were clear to auscultation but noted "on forced expiration, has prolonged wheeze and end expir[atory] wheeze."  (Tr. 776.)  He prescribed antibiotics and prednisone, and continued Hines on his other asthma medication (i.e., Advair, Albuterol, Spiriva, and ProAir.)  (Tr. 776-777.)

On June 2, 2015, Hines presented to Dr. Rosian for follow up.  (Tr. 753-760.)  He reported pain in his knees, hip, and left shoulder, as well as "one set of hives in May 2015" as a result of sun exposure.  (Tr. 753.)  With regard to his knees, Hines stated he "was doing the elliptical and the right knee went bad all of a sudden, the left knee feels like it will pop out of place."  (Id.)  With regard to his shoulder, Hines explained he had injured it after "lifting bench press" and had received an injection from Dr. McIntosh.  (Id.)  On examination, Hines' lungs were clear with no wheezing, rhonchi, or rales and his gait and sensation were both normal.  (Tr. 755.)  Joint examination revealed tenderness and minimal swelling to all his MCP joints, as well as grinding and limited range of motion in his left shoulder.  (Id.)  There was no effusion, laxity, or synovitis in his knees.  (Id.)  Dr. Rosian characterized Hines' lupus as follows: "steady joints, not a lot of baseline inflammation in the joints if he over does it."  (Id.)

Hines returned to Dr. Rosian on June 9, 2015 with complaints of increased shoulder pain after "doing lots of work around the house" and lifting weights.  (Tr. 761-766.)  On examination, Dr. Rosian noted swelling and tenderness in Hines' hands and wrist, as well as left shoulder tenderness and limited active range of motion.  (Tr. 762.)  Dr. Rosian administered an injection in

Hines' left shoulder.  (*Id.*)  She described Hines' lupus as "generally doing well," but prescribed a cane for balance.  (*Id.*)

On June 11, 2015, Hines established treatment with primary care physician Muhamad Musa, M.D., after Dr. McIntosh retired.  (Tr. 729-732.)  Hines reported "extensive problems with pain and discomfort for the last two years."  (Tr. 731.)  On examination, Dr. Musa noted clear lungs, no wheezes, normal range of motion in all joints, normal skin (no rashes or ulcers), normal pulses, normal gait, normal coordination, no motor or sensory deficit, and normal mood and affect.  (Tr. 732.)  Dr. Musa characterized Hines' lupus as "stable at this time with above medications [i.e., Methotrexate, Plaquenil, Tramadol]" and advised him to continue to follow with rheumatology.  (Tr. 729.)  He stated Hines' interstitial lung disease/lupus lung "also seems to be stable and controlled on medication."  (Tr. 729, 731.)

Hines returned to Dr. Musa on August 11, 2015 with complaints of facial pressure, sore throat, headache, rhinorrhea, and nasal drainage.  (Tr. 725-728.)  Examination findings were largely normal, aside from nasal congestion and mild sinus tenderness.  (Tr. 727.)  Dr. Musa prescribed antibiotics.  (Tr. 726.)

On August 20, 2015, Hines complained of left shoulder pain from lifting weights.  (Tr. 723-724.)  Dr. Musa noted as follows:

> Developed left shoulder pain when he was lifting weights 8-9 months ago.  He was seen by Rheumatology who injected left shoulder with good results, but pain recurred 2 months after.  Previous [primary care physician] gave another injection 3 months ago, but pain persisted. Using NSAIDs and Tramadol for pain.  No numbness, tingling, focal weakness.

(Tr. 723.)  Examination revealed full range of motion in all four extremities, normal range of motion in all joints, normal above and behind back reach with slight discomfort.  (*Id.*)  An x-ray

12

of Hines' left shoulder was negative for abnormality.  (*Id.*)  Dr. Musa referred him to physical therapy.  (*Id.*)  Hines returned to Dr. Musa on October 5, 2015.  (Tr. 749-750.)  He reported improvement in his left shoulder pain after physical therapy.  (*Id.*)  Examination findings were normal.  (*Id.*)

On November 18, 2015, Hines complained of "aching legs at night" and stated he was only sleep four to five hours per night.  (Tr. 745-748.)  He also reported recurring left shoulder pain and requested a referral to an orthopedist.  (Tr. 747.)  Examination findings were normal, including clear lungs, no wheezes, full range of motion in all extremities, normal range of motion in all joints, no edema, and normal pulses.  (*Id.*)  Dr. Musa again noted that Hines' lupus and interstitial lung disease/lupus lung were stable.  (Tr. 745.)  He changed Hines' sleeping medication from Ambien to Belsomra.  (Tr. 746.)

Hines returned to Dr. Musa on January 8, 2016 with complaints of a swollen gland on the left side of his head.  (Tr. 743-744.)  He also reported generalized pain in his hips, shoulders, and hands.  (*Id.*)  Hines denied breathing problems, chest tightness, and shortness of breath.  (*Id.*)  Examination findings were normal, aside from a possible lipoma on Hines' neck.  (*Id.*)  Dr. Musa assessed a lupus flare up and prescribed a Medrol Dosepak.  (*Id.*)

On February 12, 2016, Hines presented to Dr. Rosian.  (Tr. 767-772.)  He stated the Medrol Dosepak had "really helped" but reported an increase in his hip, knee, and ankle pain. (Tr. 767.)  On examination, Dr. Rosian noted swelling and tenderness in Hines' hands and wrists, as well as shoulder tenderness and limited active range of motion.  (Tr. 768.)  In addition, Dr. Rosian noted Hines' lungs were clear to auscultation.  (*Id.*)  She diagnosed lupus, and noted Hines' "labs have been doing well."  (*Id.*)  Dr. Rosian also assessed insomnia and bilateral low

13

back pain without sciatica.  (*Id*.)  She prescribed Gabapentin, in addition to Tramadol and Methotrexate.  (*Id*.)

Hines returned to Dr. Musa several days later, on February 17, 2016, with complaints of recurring left shoulder pain.  (Tr. 739-742.)  He denied breathing problems, chest tightness, and shortness of breath.  (Tr. 740.)  Examination findings were normal, and Dr. Musa described Hines' lupus and interstitial lung disease as stable with medication.  (Tr. 739, 741.)  He referred Hines to an orthopedist.  (Tr. 741.)

On February 22, 2016, Hines presented to nephrologist Richard May, Jr., M.D., for evaluation and treatment of his kidney problems.  (Tr. 796-797.)  Dr. May noted Hines had "cancelled and no showed numerous times."[7]  (Tr. 796.)  He stated Hines had a history of stage 1 chronic kidney disease.  (*Id*.)  Hines reported joint pain and swelling, but indicated his pain was "okay and generally controlled with Tramadol."  (Tr. 796-797.)  Examination findings were normal, including normal gait and no edema.  (*Id*.)  Dr. May diagnosed (1) chronic nephritic syndrome with unspecified morphologic changes; (2) proteinuria; and (3) essential hypertension. (*Id*.)  He ordered blood work and advised Hines to continue taking Hydrochlorothiazide.  (*Id*.)

On March 7, 2016, Hines returned to Dr. Musa with complaints of a cyst behind his ear. (Tr. 791-792.)  Hines reported he had developed swelling at the base of his neck for the past few weeks which caused discomfort with palpation and interfered with his sleep.  (*Id*.)  He also stated he had a history of morton's neuroma of left foot, which "seemed to be recurring."  (*Id.*) Examination findings were normal, including clear lungs, no wheezes, and no edema.  (*Id*.)  Dr.

---

[7] The only other treatment records from Dr. May in the record are dated November 8, 2012 and November 13, 2013, both of which are prior to Hines' onset date.  (Tr. 798-805.)

Musa referred Hines to an Otolaryngologist for his neck cyst, and to a podiatrist for his foot neuroma.  (*Id.*)

**C.     State Agency Reports**

**1.          Physical Impairments**

On October 8, 2014, state agency physician Diane Manos, M.D., reviewed Hines' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 136-139.)  Dr. Manos opined Hines could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 6 hours in an 8 hour workday; and sit for a total of 6 hours in an 8 hour workday.  (*Id.*)  She further concluded Hines had an unlimited capacity to push and/or pull and could frequently balance; occasionally stoop, kneel, crouch, crawl and climb ramps/stairs; and never climb ladders/ropes/scaffolds.  (*Id.*)  Dr. Manos found Hines had an unlimited capacity to reach in any direction, but was limited to frequent handling and fingering bilaterally.  (*Id.*)  Finally, Dr. Manos found Hines should avoid concentrated exposure to extreme temperatures, avoid even moderate exposure to pulmonary irritants (such as fumes, odors, dusts, gases, etc.), and unprotected heights/hazards.  (*Id.*)

On January 10, 2015, state agency physician Gerald Klyop, M.D., reviewed Hines' medical records and completed a Physical RFC Assessment.  (Tr. 154-157.)  He reached the same conclusions as Dr. Manos.  (*Id.*)

**2.          Mental Impairments**

On September 17, 2014, Hines underwent a psychological consultative examination with Sudhir Dubey, Psy.D.  (Tr. 486-494.)  Dr. Dubey summarized Hines' examination as follows:

> I had the opportunity to initially evaluate Daniel Hines on September 17, 2014. He came in reporting that he is currently applying for disability benefits, of his own

15

decision, for problems with lupus and related memory problems. He also has a history of attention deficit disorder.  He has been receiving medication for the last five years.  He reports that he has been taking an antidepressant for the last one month, intermittently. This is medication that was prescribed for his wife.  He is not taking this under the care of a physician. He finds it to be beneficial at times. He reports his mood in general as being depressed and irritable over the past one year. Various factors include physical health changes, job loss and interpersonal issues with his wife. He reports weight loss, through diet and activity change, of 27 pounds over the last four months.  He reports that his sleeping pattern has improved in the last two weeks with his medication. * * *  On a daily basis, he is able to take care of himself independently.

Daniel presented for the session dressed casually, neatly and groomed appropriately. His thought processes were coherent and logical. He was oriented to person, place, time and evaluation situation. * * * He was calm and friendly. His performance on the objective testing indicated that his full-scale IQ score is in the borderline range. These results are deemed to be an underestimate based on his performance on the other subtests and general level of functioning indicated. It is more likely that he is functioning in the low average range of intellectual functioning given the circumstances. His performance on the objective memory testing is deemed to be valid.

(Tr. 491.)

Dr. Dubey diagnosed mild neurocognitive disorder due to medical etiology; depressive disorder due to another medical condition with mixed depressive features; and alcohol use disorder, moderate, early remission.  (Tr. 492.)  He found Hines would be able to understand, remember, and carry out simple and multi-step instructions independently.  (*Id.*)  Dr. Dubey further concluded Hines would be able to maintain persistence and pace to remember and carry out simple instructions independently, but would not be able to maintain persistence and pace to remember and carry out multi-step instructions without supervision due to his memory problems.  (*Id.*)  Dr. Dubey found Hines would not have issues dealing with co-workers and supervisors, but would have "some issues" dealing with work pressure due to "possible problems stemming from memory issues leading to associated frustration for the claimant."  (Tr. 493.)

16

On October 8, 2014, state agency psychologist Aracelis Rivera, Psy.D., reviewed Hines' medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  (Tr. 134-135, 139-141.)  In the PRT, Dr. Rivera found Hines had mild restrictions in his activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace.  (Tr. 135.)  In the Mental RFC, she opined Hines was moderately limited in his abilities to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (4) respond appropriately to changes in the work setting.  (Tr. 139-141.)  Specifically, Dr. Rivera found Hines could (1) understand and remember simple instructions in a work setting where a coworker is available to occasionally explain tasks; (2) perform simple, routine tasks in a work setting where there are not demands for fast pace; and (3) adapt to a low stress work setting where changes in routine are infrequent.  (*Id*.)

On January 21, 2015, state agency psychologist Mary K. Hill, Ph.D., reviewed Hines' medical records and completed a PRT and Mental RFC Assessment.  (Tr. 152-153, 157-159.) Dr. Hill reached the same conclusions and assessed the same limitations as Dr. Rivera, but further concluded Hines was moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 157-159.)  Specifically, Dr. Hill found Hines could (1) understand and remember simple instructions in a work setting where a coworker is available to occasionally explain tasks; (2)

17

perform one to three step tasks with no more than moderate pace or production quotas; (3) adapt

to a low stress work setting where changes in routine are infrequent; and (4) interact with others

on a superficial level with no customer service duties, conflict resolution or persuading others.

(Tr. 159.)

**D.     Hearing Testimony**

During the July 7, 2016 hearing, Hines testified to the following:

- He lives in a house with his wife, daughter and grandson.  (Tr. 84.)  He attended "some college" and has a driver's license.  (*Id.*)

- He suffers from lupus, which causes fatigue, insomnia, joint pain, and sun sensitivity.  (Tr. 87-88.)  With regard to his fatigue, he described it as a "constant, slow, lethargic feel."  (*Id.*)  He feels like he's "walking around in syrup most of the day."  (*Id.*)  He does not sleep "at all" most nights, normally getting three to six hours per night.  (Tr. 87, 89.)  He takes two to three naps daily and "struggles to get through the day."  (Tr. 90.)

- With regard to his joint pain, he is in physical pain "all the time."  (Tr. 88.)  The pain is mostly in his larger joints (ankles, knees, and elbows), as well as his hands.  (*Id.*)  He takes Tramadol and Gabapentin.  (*Id.*)  With medication, his pain ranges between a 1 and 3 on a scale of 10, on a normal day.  (*Id.*)  His hand pain is exacerbated by repetitive motions.  (*Id.*)  His hands cramp or "lock up" when he writes, brushes his teeth, or plays the guitar for more than 10 to 15 minutes.  (Tr. 93.)  He frequently drops things and has "lost his fine motor skills."  (*Id.*)  In addition, holding cold things causes excruciating pain.  (Tr. 96.)

- Exposure to the sun makes him physically ill.  (Tr. 95.)  It upsets his stomach, burns his skin, and has caused him to break out in hives.  (*Id.*)  Because of his sun sensitivity and fatigue, he no longer does outdoor chores such as mowing the lawn.  (Tr. 94.)  He has hired a landscaping company for the past two years. (*Id.*)

- He also suffers from interstitial lung disease and emphysema.  (Tr. 85.)  His lung conditions are aggravated by "just being awake breathing."  (*Id.*)  He described it as "kind of like having a sock wrapped around your face most of the day.  When you take your medications, the sock is still there, but it's kind of a little thinner. You still . . . struggle for air and get fatigued." (*Id.*)

- In winter, he is more susceptible to bronchitis and pneumonia.  (Tr. 86.)  He is

"very reactive" to perfumes, cologne, and smoke.  (*Id.*)  He used to smoke cigarettes, but quit 16 years ago.  (Tr. 85-86.)

- He also suffers from memory problems and confusion.  (Tr. 92, 95-96.)  When he is driving, he sometimes forgets where he is or where he's going.  (Tr. 95.)  He also forgets whether he has taken his medication.  (Tr. 95-96.)  He loses his train of thought and forgets words.  (*Id.*)

- His medications include Methotrexate, Tramadol, Gabapentin, and Adderrall.  (Tr. 85, 88-89.)  His pain medications make him feel "a little slow, lethargic at times."  (Tr. 85.)  The Methotrexate "blows his immune system," causing him to get sick easily.  (*Id.*)  It also takes him longer to get over colds and flus.  (*Id.*)  His nebulizer breathing medication makes his heart race and causes him to feel jittery and jumpy.  (*Id.*)

- On a typical day, he wakes up and "start[s] moving [his] hands first because those are usually the ones that hurt the most, and they're usually swelled."  (Tr. 90.)  He then sits on his bed and moves his ankles.  (*Id.*)  When he's done, he goes downstairs to take his medication.  (*Id.*)  He then lays on the couch for one to three hours.  (*Id.*)  After that, he gets dressed and eats.  (*Id.*)

- He is home by himself some of the time.  (Tr. 91.)  He is able to cook for himself and does some chores, explaining "I do what I can when I can."  (*Id.*)  When he does do chores, it takes him longer due to his fatigue.  (*Id.*)  He drives once or twice per week, mostly to doctor's appointments.  (*Id.*)  Driving long distances causes "a lot of pain" due to the prolonged sitting.  (Tr. 95.)  He goes to the local produce store by himself for a quick shopping trip, but does not generally go grocery shopping or to Wal Mart because it is difficult for him to walk.  (Tr. 91-92.)

- He has good days and bad days.  (Tr. 91.)  On good days, he has a "burst of energy" and tries to get things done.  (*Id.*)  The next few days, however, he will "pay for it."  (Tr. 91, 93-94.)  On bad days, he spends the day on the couch or in his bed.  (*Id.*)  He has two to three good days per month.  (Tr. 93.)

- He stopped working due to his medical conditions.  (Tr. 92.)  He was running the injection molding floors at two plants and he just "couldn't function."  (*Id.*)  He was making mistakes, missing things, and was often late or out sick.  (*Id.*)  He was too tired and in too much pain to continue working.  (*Id.*)

The ALJ then posed the following hypothetical question to the VE:

Please consider an individual born December 1963 with a high school education,

19

same past work that you describe at Exhibit 14E.[8]  For the first hypothetical, Mr. Yee, the individual can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. Excuse me.  This person can sit for six hours, stand and/or walk for six hours in a normal workday.  This person cannot climb ladders, ropes or scaffolds and can occasionally climb ramps and stairs.  The person can occasionally stoop, kneel, crouch and crawl.  This person can frequently handle and finger bilaterally.  This person must avoid concentrated exposure to temperature extremes of hot and cold.  This person must avoid concentrated exposure to dust, fumes, gases, odors and poorly ventilated areas.

This person must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery.  This person is limited to simple, routine tasks that do not involve directing the work of others or being responsible for the safety or welfare of others.  This person cannot perform piece rate work or assembly line work.

(Tr. 98.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as mailroom clerk (light, unskilled, SVP 2); order caller (light, unskilled, SVP 2); and merchandise marker (light, unskilled, SVP 2).  (Tr. 100.)

The ALJ then asked the VE to consider the first hypothetical but modified to occasional handling and fingering.  (*Id.*)  The VE testified "there would be no competitive employment in the light unskilled job." (*Id.*)

The ALJ then asked the VE to consider the first hypothetical but modified to only two hours of standing and walking.  (*Id.*)  The VE testified only sedentary jobs would be available for such an individual.  (*Id.*)

Finally, the ALJ asked the VE to consider the first hypothetical with the additional limitation that "based on the combination of mental issues, the individual is going to miss work four days every month."  (*Id.*)  The VE testified there would be no full-time competitive

---

[8] In Exhibit 14E, the VE stated Hines had past relevant work as a supervisor– injection molding (medium, skilled, SVP 8).  (Tr. 312.)

20

employment for such an individual.  (Tr. 100-101.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

21

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the

claimant's impairment or combination of impairments does not prevent him from doing his past

relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his

past relevant work, if other work exists in the national economy that the claimant can perform,

the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Hines was insured on his alleged disability onset date, May 30, 2014, and remained

insured through December 31, 2018, his date last insured ("DLI.")  (Tr. 60.)  Therefore, in order

to be entitled to POD and DIB, Hines must establish a continuous twelve month period of

disability commencing between these dates.  Any discontinuity in the twelve month period

precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988);

*Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act
through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since May 30,
2014, the alleged onset date (20 CFR 404.1571 et seq.)

3.    The claimant has the following severe impairments: systemic lupus
erythematosus, chronic kidney disease, affective disorder, neurocognitive
disorder, obesity, and asthma (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments
that meets or medically equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
and 404.1526.)

5.    After careful consideration of the entire record, I find that the claimant has

22

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant cannot climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs.  The claimant can occasionally stoop, kneel, crouch, and crawl.  He can frequently handle and finger bilaterally.  He must avoid concentrated  exposure to temperature extremes of hot and  cold, and must avoid concentrated  exposure to dusts, fumes, odors, etc.  He must avoid workplace hazards such as unprotected heights or dangerous moving machinery.  The claimant is limited to simple, routine tasks that do not involve directing the work of others or being responsible for the safety or  welfare of others. He cannot perform piece rate work or assembly line work.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565.)

7.  The claimant was born on December ** 1963 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 30, 2014 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 60-72.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.

24

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Listing 14.02*

In his first assignment of error, Hines argues the ALJ erred in finding he did not meet the requirements of Listing 14.02 for lupus.  (Doc. No. 17 at 10-12.)  First, he maintains the ALJ misstated the elements of Listing 14.02 by improperly finding that it requires the involvement of *two or more* organs/body systems to at least a moderate level of severity.  (*Id*. at 10.)  Rather, Hines asserts the clear language of Listing 14.02 requires that only *one* organ or body system

25

must be involved to at least a moderate level of severity.  (*Id*.)  Hines further argues the ALJ

improperly found that his respiratory, skin, and immune-system impairments were not at least

moderately severe.  (*Id*. at 10-12.)  With regard to his respiratory impairments, Hines notes he

was diagnosed with lupus lung, CT imaging showed emphysema and atelectasis, and treatment

notes repeatedly documented expiratory wheezing and decreased lung function.  (*Id*. at 11.)  With

regard to his skin impairment, Hines argues his photosensitivity "caused at least moderate

limitations," noting "on his first summer sun exposure of 2014 Plaintiff developed hives for four

weeks." (*Id*.)  Finally, with regard to his inflammatory arthritis, Hines emphasizes Dr. Rosian's

numerous findings of joint stiffness, tenderness, and swelling.  (*Id*.)

       The Commissioner argues substantial evidence supports the ALJ's finding that Hines

did not meet or equal Listing 14.02A.  (Doc. No. 18 at 13-18.)  The Commissioner acknowledges

the ALJ improperly stated that the Listing required involvement of two or more organs/body

systems to at least a moderate level of severity but argues this amounts to harmless error,

asserting "this had no practical outcome on the decision, as the ALJ did not find involvement of

any organs/body systems to a moderate level of severity." (*Id*. at 14.)  She argues the medical

evidence shows that, while Hines sometimes exhibited symptoms from his respiratory

impairments, treatment records indicate this condition was stable and controlled with medication.

(*Id.* at 16.)  The Commissioner then asserts the only evidence of Hines' photosensitivity predates

his alleged onset date by one year and argues he did not receive any medical treatment for this

condition during the relevant time period.  (*Id*. at 17.)  Finally, with regard to Hines'

inflammatory arthritis, the Commissioner argues "the medical record showed minimal and

infrequent complaints" regarding this issue.  (*Id*. at 17.)  She also emphasizes treatment records

showing only minimal joint swelling.  (*Id.*)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify

27

as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Here, Hines argues the ALJ erred in finding he did not meet the requirements of Listing 14.02.  That Listing defines lupus or "Systemic Lupus Erythematosus ("SLE")" as:

> a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro—and anti-coagulant proteins that may occur in a highly variable pattern.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D1.  To satisfy the requirements of Listing 14.02A, a claimant must have lupus as described above and the following:

> A. Involvement of two or more organs/body systems, with:
>
>> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>>
>> 2. At least two of the constitutional symptoms or signs (severe fatigue, malaise, or involuntary weight loss).

*Id.*  Listing 14.02A.[9]

---

[9] Hines does not argue he meets or medically equals the requirements of Listing 14.02B. Thus, the Court does not address this issue.

28

At step three, the ALJ expressly considered whether Hines met or equaled the

requirements of Listing 14.02A, as follows:

In terms of the claimant's physical impairments, no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(£), 416.927(f) and Social Security Ruling 96-6p).

All of the listings were considered in reaching this finding, with specific emphasis on Listing 14.02. The claimant's attorney has argued that the claimant meets Listing 14.02A, due to his diagnosis of lupus, along with associated severe fatigue, malaise, photosensitivity of the skin, fluctuating cognition, and inflammatory arthritis (Exhibit 1 SE/2).

This argument is not well taken. While the claimant does experience all of the above symptoms, he does not do so to the degree contemplated by the listing. Listing 14.02 requires involvement of two or more organs/body systems to at least a moderate level of severity and at least two of the constitutional symptoms or signs (severe fatigue, malaise, fever, or involuntary weight loss).

Under the Listings, major organ or body system involvement can include respiratory, cardiovascular, hematologic, skin, neurologic, mental, mood disorders, organic brain syndrome, or immune system disorder. It is true that the claimant does have respiratory issues, but his lung issues are stable and controlled on medications (Exhibit 1SF/6). He also has some depression and memory issues, but he does not see a mental health professional for these issues, and beyond some medications from his primary care doctor, does not receive any treatment for them (Exhibit 12F/20). The claimant has chronic kidney disease, but he very rarely treats with a nephrologist, and it appears this is overall stable (Exhibit 1F/14, 21F/6, 4). He also has mentioned some photosensitivity to the sun, but he has not required any emergency room or intensive treatment for such. It does not appear that his organ and body system involvement are at the moderate degree required by the listing.

The claimant does not have any documented instances of fever. While he has lost some weight during the relevant period, it was not involuntary (Exhibit 8F/3). The claimant does have some malaise and fatigue, but they are not to a severe degree. In fact, in September 2014, the claimant reported improved energy levels (Exhibit 8F/3). He uses the treadmill for exercise (Exhibit 4F/38,

29

> 10F/25), and in February 2015, the claimant indicated he was exercising 2-5
> times a week (Exhibit 11F/2).  While this exercise is commendable, it does not
> support a finding that the claimant has such severe malaise and fatigue that he
> would meet Listing 14.02.

(Tr. 62-63.)

As an initial matter, the Court agrees that the ALJ misstated the requirements of Listing 14.02A.  While the ALJ states that Listing requires "involvement of two or more organs/body systems to at least a moderate level of severity," the regulations in fact require "involvement of two or more organs/body systems, with . . . *one* of the organs/body systems involved to at least a moderate level of severity."  Listing 14.02(A) (emphasis added).  Moreover, the Court further notes that, while the ALJ discussed Hines' respiratory condition, depression, memory issues, chronic kidney disease, and photosensitivity in the context of his step three analysis, the decision failed to explicitly discuss Hines' inflammatory arthritis at this step.

However, the Sixth Circuit has found that, even where an ALJ's step three analysis is insufficient, remand is not required where the error is harmless.  *See e.g., Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 364-366 (6th Cir. Nov. 17, 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 412, 417 (6th Cir. July 15, 2014); *Bledoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006).  *See also Ison v. Comm'r of Soc. Sec.*, 2017 WL 4124586 at * 5-6 (S.D. Ohio Sept. 18, 2017); *Cygan v. Comm'r of Soc. Sec.*, 2016 WL 1128087 at * 2-3 (E.D. Mich. March 23, 2016); *Vidot v. Colvin*, 2015 WL 3824360 at * 5-7 (N.D. Ohio June 18, 2015); *Wilson v. Colvin*, 2015 WL 1396736 at * 3-4 (E.D. Tenn. March 26, 2015).  For example, a court may find an ALJ's failure to discuss whether a claimant meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."  *Forrest*, 591 Fed. Appx. at

366.  *See Bledsoe,* 165 Fed. Appx. at 411 (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a second time"); *Burbridge*, 572 Fed.Appx. at 417 (acknowledging an ALJ's step-three analysis was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion).  *See also Ison*, 2017 WL 4124586 at * 5; *Vidot*, 2015 WL 3824360 at * 6.

Moreover, even if an ALJ's factual findings fail to support his step three findings, the Sixth Circuit has found the error harmless where a claimant fails to show that his impairments met or medically equaled in severity the listing.  *See Forrest*, 591 Fed. Appx. at 366 ("And even if these reasons failed to support the ALJ's step-three findings, the error is harmless, because Forrest has not shown that his impairments met or medically equaled in severity any listed impairment between October 2006 and July 2011"); *Cygan*, 2016 WL 1128087 at * 3 (finding "the remand sought by Plaintiff is precluded by virtue of his utter failure to show harm resulting from the ALJ's inadequate step three analysis").

The Court finds remand is not required in the instant case for the following reasons. The ALJ expressly acknowledged and addressed Hines' argument he met the requirements of Listing 14.02A.  (Tr. 63.)  The ALJ discussed the medical evidence regarding Hines' respiratory condition, depression, memory issues, chronic kidney disease, and photosensitivity, but determined none of these conditions rose to the level of moderate severity as required by the

31

Listing.[10]  Moreover, later in the decision, at step four, the ALJ addressed the medical evidence

regarding Hines' inflammatory arthritis at length.  As discussed below, the ALJ's findings are

supported by substantial evidence.

With regard to Hines' respiratory impairment, the ALJ acknowledged Hines "does have

respiratory issues" but found "his lung issues are stable and controlled on medications."  (Tr. 63.)

The ALJ also discussed Hines' respiratory issues at step four, as follows:

> The claimant does have some associated respiratory issues as well.  He was
> diagnosed with asthmatic bronchitis in October 2013, though by May 2014, his
> symptoms had resolved (Exhibit 3F/3). In late 2014, he did develop another
> upper respiratory infection, but he was still able to exercise on a regular basis.
> He did require a nebulizer and inhaler for treatment (Exhibit 10F/25).
>
> The claimant did not return to his pulmonologist, Dr. Charles Fuenning, until
> February 2015. Dr. Fuenning noted that he had not seen the claimant in over 3
> years, and his last CT scan did confirm lupus lung.  The claimant reported some
> shortness of breath and wheezing, along with regular inhaler and nebulizer use.
> However, he also indicated he was able to exercise 2-5 times a week (Exhibit
> 11F/2).  Dr. Fuenning continued him on his inhalers, and ordered some updated
> testing (Exhibit 11F/3, 4).
>
> A February 2015 CT of the chest revealed some scattered emphysematous
> changes, along with bilateral dependent subsegmental atelectasis (Exhibit
> 13F/15).   An April 2015 pulmonary function test indicated a small airways
> obstruction, with no pulmonary limitation to exertion (Exhibit 13F/14).
>
> The claimant followed up with Dr. Fuenning after this testing in April 2015.  He
> indicated his breathing had not been too bad, and his Spiriva had been helping
> (Exhibit 13F/4).  The claimant has not returned to Dr. Fuennings office for the
> past year.  In August 2015, he renewed his inhalers through his primary care
> doctor, and his doctor noted that his lung issues were "stable and controlled" on
> medications (Exhibit 15F/6).

(Tr. 67.)

---

[10] Hines does not argue the ALJ erred in finding his chronic kidney disease, depression,
and memory issues were not moderately severe for purposes of Listing 14.02A.

32

The ALJ's step three finding that Hines' respiratory impairment is not of moderate severity is supported by substantial evidence.  As the ALJ correctly notes, the record reflects Hines was diagnosed with "lupus lung" and often complained of shortness of breath.  (Tr. 348-349, 463-464, 469-470, 473-474.)  In addition, examination in January 2014 revealed coarse breathing sounds, diffuse wheezes, and expiratory wheezing.  (Tr. 463-464, 465.)  However, respiratory physical examination findings in May, June, August, September and November 2014 were  normal.  (Tr. 362-363, 469-470, 473-476, 481, 608.)  Moreover, although his physicians encouraged him to see his pulmonologist, the record reflects Hines did not present to pulmonologist Dr. Fuenning until February 2015, after a nearly three year absence.  (Tr. 647-650.)  At that time, Dr. Fuenning noted clear lungs without wheezing but found Hines had prolonged wheeze "on forced expiration."  (Tr. 648.)  He ordered a CT of Hines' chest, which showed bilateral atelectasis and "scattered emphysematous changes."  (Tr. 710.)

While pulmonary function testing undertaken in April 2015 showed small airways obstruction, it also revealed "no desaturation with moderate exertion" and "no pulmonary limitation to exertion."  (Tr. 708, 709.)  In addition, when Hines returned to Dr. Fuenning later that month, he reported medication had helped and his "breathing has not been too bad."  (Tr. 775.)  Respiratory examinations by Dr. Rosian and Dr. Musa in June and November 2015, and January, February and March 2016, were normal.  (Tr. 755, 729-732, 745-748, 743-744, 768, 739-742, 791-792.)  Indeed, in January and February 2016, Hines denied breathing problems, shortness of breath, and chest tightness.  (Tr. 743-744, 739-742.)  Between June 2015 and February 2016, Dr. Musa described Hines' interstitial lung disease as "stable and controlled on medication."  (Tr. 729, 745, 739.)

In light of the above, the Court finds substantial evidence supports the ALJ's finding that Hines' respiratory condition did not rise to a moderate level of severity.  Although there is some objective evidence documenting emphysematous changes and small airways obstruction in Hines' lungs, the medical record supports the ALJ's finding Hines' respiratory condition was controlled by, and improved with, medication.  Pulmonary function testing showed "no pulmonary limitation to exertion" and, with a few exceptions, respiratory examinations were largely normal.  Under these circumstances, the Court finds the ALJ's finding that Hines' respiratory condition was not of moderate severity is supported by substantial evidence in the record.

With regards to Hines' photosensitivity, the ALJ found Hines "has not required any emergency room or intensive treatment for such." (Tr. 63.)  The Court notes there is little medical evidence in the record regarding Hines' photosensitivity.  In June 2013 (nearly a year prior to Hines' May 2014 onset date), Dr. Rosian noted that Hines recently vacationed in Myrtle Beach and "got hives in the summer, first dose sun, trouble for about 4 weeks." (Tr. 348.)  Nearly a year later, in May 2014, Hines reported rashes when exposed to sunlight, although examination on that date revealed no suspicious rashes or lesions.  (Tr. 361-362.)  Several months later, in November 2014, examination revealed a rash on Hines' hands, although it is not clear whether this was the result of sun exposure.  (Tr. 607-608.)  On June 2, 2015, Hines reported having experienced "one set of hives in May 2015" as a result of sun exposure.  (Tr. 753-754.)  However, both on that date and later that month, examination revealed normal skin with no rashes or ulcers.  (Tr. 732, 754.)  Finally, during the hearing, Hines testified the sun makes him physically ill and causes him to break out in hives and, therefore, he no longer does

any outdoor chores.  (Tr. 94-95.)

In light of the paucity of medical evidence regarding Hines' photosensitivity, the Court finds the ALJ did not err in concluding this condition did not rise to the level of moderate severity.  As the ALJ suggested, Hines' treatment for this issue appears to be of a conservative nature and sporadic at best.  As noted *supra*, it is the plaintiff's burden, at the step three, to demonstrate that his impairments meet or equal all of the criteria of a listing.  *See Sullivan*, 493 U.S. at 530; *Cygan*, 2016 WL 1128087 at * 1.  Here, Hines has failed to meet his burden of demonstrating the ALJ erred in finding his photosensitivity was not of moderate severity.

With regard to Hines' inflammatory arthritis, the ALJ did not directly address this condition at step three.  However, as noted *supra*, an ALJ's failure to discuss whether a claimant meets or medically equals the specific requirements of a Listing may be considered harmless error when "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three."  *Forrest*, 591 Fed. Appx. at 366.  *See also Bledsoe,* 165 Fed. Appx. at 411.  Here, the ALJ discussed Hines' inflammatory arthritis at length at step four, as follows:

> The record reflects that the claimant began to experience some inflammatory polyarthritis symptoms in 2005, and began to treat with a rheumatologist at the Cleveland Clinic for such in 2009 (Exhibit 3F/6).  In May 2014, the claimant reported an increase in his symptoms, including fatigue, pain in his joints, and joint swelling.  He rated the pain as a 4/10 (Exhibit 3F/3).  On examination, his gait was normal.  He did have some tenderness and minimal swelling in his joints (Exhibit 3F/4).  His doctor determined he has having a lupus flare, and prescribed him some prednisone for his symptoms (Exhibit 3F/5).  It appears that this flare did resolve by August 2014, as he began to exercise on a treadmill around that time (Exhibit 4F/38).
>
> The claimant returned to Dr. Rochelle Rosian, his rheumatologist, in September 2014. He indicated that he had stopped working.  However, he also reported he had been losing weight, and had an improvement in his joint pain and energy level.  He did report trouble sleeping through the night (Exhibit 8F/3).  On examination, the claimant again had some minimal swelling in his joints.  His

35

ANA factor was negative, but he did have a Vitamin D deficiency.  Dr. Rosian characterized his condition as "steady" (Exhibit 8F/5).

In November 2014, the claimant visited his primary care doctor, Dr. G. Andrew McIntosh.  He reported that he had been working out more, and using the treadmill for exercise (exhibit l0F/25). In December 2014, he reported some knee, right hip, back, and left shoulder pain, but did report he was taking steroids with improvement (Exhibit 12F/21).   In January 2015, Dr. McIntosh administered a left shoulder and right hip injection, due to the claimant's continued pain (Exhibit 12F/23, 24).

The claimant returned to his rheumatologist in June 2015.  He reported that he had been doing some stretching for his SI joint pain.  He also reported that he recently had been using the elliptical for exercise, and had hurt his knees.  He relayed that he had been lifting weights as well several months ago, and how [sic] was having left shoulder pain (Exhibit 18F/3).  On examination, the claimant's gait was normal and his sensation was intact.  He had minimal swelling in his joints, no effusion in his knees, and no synovitis in his knees.  He did have some grinding and a decreased range of motion in his left shoulder (Exhibit 18F/5).

The claimant returned to his rheumatologist a few days later, again reporting increased pain in his left shoulder (Exhibit 18F/11).  His doctor found a limited range of motion, but no weakness, in the shoulder.  She injected his left shoulder, and referred him to physical therapy.  She did note that in terms of his lupus he was "generally doing well" (Exhibit 18F/12).

The claimant's primary care physician, Dr. McIntosh, retired in 2015.  In June 2015, the claimant began to see Dr. Muhammad Musa instead.  During his first examination, he had a normal range of motion in all of his joints, a normal gait, and no motor sensory deficit (Exhibit 15F/13).  In August 2015, Dr. Musa noted that the claimant's lupus was stable on his medications (Exhibit 15F/6).  The claimant did continue to report left shoulder pain, but a shoulder x-ray was negative for any abnormality.  On examination, he had a normal range of motion in his joints, and his behind back reach was normal.  He did have slight discomfort at his biceps on exam.  Dr. Musa recommended a course of physical therapy (Exhibit 15F/4).

The claimant did attend a brief course of physical therapy.  He returned to Dr. Musa's office in October 2015, and reported improvement after the physical therapy and exercise.  The claimant did take Tramadol as needed for his pain (Exhibit 17F/14).  In November 2015, the claimant reported that he was having aching in his legs at night, and was only able to sleep 4-5 hours at night (Exhibit 17F/10).  Dr. Musa then adjusted his sleeping medications (Exhibit 17F/11).

36

> In early 2016, the claimant had a flare of lupus, and he was having generalized pain in all of his joints.  Dr. Musa prescribed his a course of steroids (Exhibit 17F/8).  The claimant finally returned to his rheumatologist's office in February 2016.  He indicated an increase in his hip, knee, and ankle pain, but reported that the course of steroids had really improved his symptoms  (Exhibit 18F/17).  Dr. Rosian reviewed his most recent labwork, and noted that his lupus labwork was "doing well."  She renewed his prescriptions for Neurontin, Methotrexate, and Tramadol (Exhibit 18F/18).

(Tr. 66-67.)

The Court finds the ALJ's failure to discuss Hines' inflammatory arthritis at step three to be harmless in light of his extensive discussion of this condition at step four.  As set forth above, the ALJ acknowledged Hines' repeated complaints of joint pain, stiffness, and swelling, as well as physical examination findings of joint tenderness, swelling, and limited range of motion.  (Tr. 66-67.)  In addition, the ALJ recognized that Hines periodically suffered from "lupus flares," during which his joint symptoms were exacerbated.  (*Id*.)  However, the ALJ noted his rheumatologist frequently found only minimal joint swelling, and his physicians generally observed normal gait, no effusion, and no motor sensory deficit.  (*Id.*)  The ALJ also observed that Hines reported improvement with steroids and physical therapy.  (*Id*.)

The ALJ's factual findings are supported by substantial evidence.  While physical examinations often revealed tenderness and "minimal" swelling in Hines' joints, Hines' physicians generally noted normal gait, normal coordination, normal range of motion in his joints and extremities, no edema, normal sensation, normal pulses, and no motor or sensory deficit.  (Tr. 361-367, 479-481, 732, 727, 723, 749, 747, 741, 792.)  Moreover, Hines reported improvement with medication and physical therapy.  For example, in September 2014, Hines stated he was "losing weight and his joints and energy are better."  (Tr. 479.)  In October 2015, he reported to Dr. Musa that physical therapy had helped with his left shoulder pain.  (Tr. 749-

750.)  In February 2016, Hines advised Dr. May that his "pain was okay and generally controlled with Tramadol." (Tr. 796-797.)  Beginning in June 2015, Hines' physicians noted his lupus was "steady," "generally doing well," and/or "stable with medication."  (Tr. 725, 729, 739, 755, 762, 768.)  In light of this evidence, the Court finds the ALJ's discussion of Hines' inflammatory arthritis at step four supports his step three finding that Hines does not meet or equal the requirements of Listing 14.02A.[11]

Finally, Hines argues the opinions of treating physicians Drs. Rosian and McIntosh provide further evidence that he meets the requirements of Listings 14.02A.  As noted *supra*, in November 2014, Dr. Rosian indicated Hines suffered from malar rash; photosensitivity; non-erosive arthritis in his hands, feet, ankles, knees, fingers, and wrists (including swelling, warmth, and tenderness); positive ANA; severe fatigue; severe malaise; muscle weakness; and poor sleep. (Tr. 498-499.)  She also identified shortness of breath and COPD as symptoms of his lupus.  (Tr. 500.)  Dr. Rosian assessed severe functional limitations, finding that "due to [the] increased fatigue, joint pain and swelling he has been experiencing, it is difficult to determine how he could be dependable for full-time work."  (Tr. 504.)  In December 2014, Dr. McIntosh also assessed severe functional limitations.  (Tr. 577-582.)  With regard to Hines' fingers, Dr. McIntosh noted clinical findings of synovitis, subchondrial sclerosis, decreased range of motion, and pain in all fingers of Hines' bilateral hands except his left fifth digit.  (Tr. 579.)  He also noted knee pain, muscle pain and weakness, joint swelling, decreased lung function, fatigue,

---

[11] The Court further finds that, because the ALJ properly found that none of Hines' organs/body systems rose to a moderate level of severity, the ALJ's misstatement that Listing 14.02A requires "involvement of two or more organs/body systems to at least a moderate level of severity," constitutes harmless error.

shortness of breath, and rashes.  (Tr. 578-582.)

As discussed at length *infra*, however, the Court finds the ALJ properly accorded "little weight" to these opinions.  Moreover, as the ALJ noted, state agency physicians Drs. Manos and Klyop found Hines did not meet or equal a Listing.  (Tr. 63, 69-70.)  The ALJ accorded "great weight" to these opinions.  (Tr. 69-70.)

While the Court acknowledges there is evidence in the record that might support Hines's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at *10 (E.D. Mich. March 1, 2018), *adopted by*, 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the factual findings supporting the ALJ's determination that Hines does not meet or equal the requirements of Listing 14.02A are within that "zone of choice" and thus supported by substantial evidence.

Accordingly, Hines' first assignment of error is without merit.

### Treating Physicians Rosian and McIntosh

In his second assignment of error, Hines argues the ALJ improperly accorded "little weight" to the opinions of treating physicians Drs. Rosian and McIntosh.  (Doc. No. 17 at 12-17.) With respect to Dr. McIntosh's opinion, Hines argues the ALJ should have accorded greater weight to this opinion because "Dr. McIntosh had treated Plaintiff before he was diagnosed with

lupus, throughout his years of treatment for lupus, while Plaintiff still retained the ability to work, and then through his end of work; his opinion was well-explained and detailed; and . . . consistent with the opinion of Plaintiff's treating rheumatologist," Dr. Rosian.  (*Id*. at 14-15.)  With regard to Dr. Rosian, Hines argues "the ALJ's characterization of the evidence was in error, and did not account for the times that Plaintiff did, in fact, complain of pain . . . and that Dr. Rosian did, in fact, find swelling and tenderness of his hands and all finger joints."  (*Id.* at 16.)  Hines further asserts that, although Dr. Rosian may have used the term "stable" in describing his lupus, that term "certainly does not mean unimpaired or unlimited."  (*Id*.)

The Commissioner argues the ALJ properly considered the opinions of Drs. Rosian and McIntosh.  (Doc. No. 18 at 18-23.)  With regard to Dr. McIntosh's opinion, the Commissioner argues substantial evidence supports the ALJ's finding that his opinion was not supported by medical findings and inconsistent with his own treatment notes.  (*Id.* at 21.)  With regard to Dr. Rosian, the Commissioner asserts the ALJ properly concluded that her opinion "was extreme when compared to the actual treatment notes," which showed only minimal swelling and generally described Hines' lupus as "stable" and doing well.  (*Id*. at 22-23.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[12]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

---

[12] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[13]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[14]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear

---

[13]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

[14] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

41

explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.

It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

### Dr. McIntosh

As set forth *supra*, on December 3, 2014, Dr. McIntosh completed a Medical Source Statement regarding Hines' "Ability to Do Work-Related Activities (Physical)."  (Tr. 577-582.) He found Hines had the following physical functional limitations:

- He could occasionally[15] lift and carry up to 10 pounds; occasionally lift 11 to 20  pounds; never carry 11 to 20 pounds; and never lift or carry more than 20 pounds;

- He could sit for 2 hours at one time without interruption and for a total of 2 hours in an 8 hour workday;

- He could stand for 1 hour at one time without interruption and for a total of 1 hour in an 8 hour workday;

- He could walk for 1 hour at one time without interruption and for a total of 1 hour in an 8 hour workday;

- He cannot walk a block at a reasonable pace on rough or uneven surfaces;

- He can never reach overhead bilaterally; occasionally reach in all other directions bilaterally; occasionally handle, finger, and feel bilaterally; and never push/pull;

- He can occasionally operate foot controls with his right foot but never with his left foot;

- He can never crawl, or climb stairs, ramps, ladders or scaffolds;

- He can occasionally balance, stoop, kneel, and crouch;

---

[15] The form defined the term "occasionally" as meaning "very little to one-third of the time."  (Tr. 577.)

43

- He can never be exposed to unprotected heights, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations;

- He can occasionally be exposed to moving mechanical parts;

- He can frequently be exposed to humidity, wetness, and operating a motor vehicle;

- He can tolerate a moderate amount of noise; and

- On average, he would likely be absent from work more than four days per month due to his impairments or treatment.

(Tr. 577-582.)  When asked to identify particular medical or clinical findings supporting his assessments, Dr. McIntosh noted generally that "lupus causes diffuse muscle pain and weakness, joint swelling anywhere in the body, centrilobular emphysema decreasing lung function, fatigue and rashes."  (Tr. 578.)  With regard to Hines' manipulative limitations in particular, Dr. McIntosh identified clinical findings of synovitis, subchondrial sclerosis, decreased range of motion, and pain in all fingers of both hands except his left fifth digit.  (Tr. 579.)  With regard to Hines' use of his feet, Dr. McIntosh identified clinical findings of "arthralgia, symmetric polyarthropathy, pain, [illegible] reticularis, and bunions cause pain in patient, as well as metatarsalgia and morton's neuromata."  (*Id.*)  With regard to Hines' postural limitations, Dr. McIntosh identified the following findings supporting his assessment: "Knees hurt bad and leg muscles hurt, too."  (Tr. 580.)  Finally, Dr. McIntosh remarked that "fatigue, pain, and dyspnea [i.e., shortness of breath] limit exertion as well as mental concentration."  (Tr. 582.)

At step four, the ALJ accorded Dr. McIntosh's opinion "little weight," explaining as follows:

> The claimant's former primary care doctor, Dr. McIntosh, filled out a form regarding the claimant's physical impairments.  He limited the claimant to lifting up to 20 pounds occasionally, and carrying up to 10 pounds occasionally (Exhibit

44

9F/3).  He opined the claimant could sit for 2 hours at one time, and stand and walk for one hour at a time.  He also found that the claimant could only sit for 2 hours total in an entire 8-hour workday, and stand and walk for one hour total in an 8-hour workday.  Dr. McIntosh indicated that the remainder of the claimant's day would be spent resting on a sofa or in bed.  He did not find that the claimant needed a cane to ambulate (Exhibit 9F/4).  He opined the claimant should never reach overhead, push, or pull, and occasionally reach in other directions, occasionally handle, finger, and feel.  He opined the claimant could occasionally use foot controls (Exhibit 9F/5).

Dr. McIntosh further found the claimant should never climb stairs, ramps, ladders, or scaffolds, and occasionally balance, stoop, kneel, and crouch, but never crawl (Exhibit 9F/6).  He found some environmental  limitations as well, opining the claimant could never work at unprotected heights, pulmonary irritants, extreme cold, extreme heat, and vibrations.  He opined the claimant could occasionally work near moving mechanical  parts, and frequently operate a motor vehicle or near humidity and wetness.  He limited the claimant to moderate noise levels, such as an office environment (Exhibit 9F/7).  He concluded that the claimant work miss work more than four times a month (Exhibit 9F/8).

The Social Security Regulations provide that controlling weight must be given to the opinion of the treating physician if the opinion is well supported and not inconsistent with the other substantial evidence of record (See 20 CFR 404.1527 and SSR 96-2p). Further, the Administrative Law Judge must articulate good reasons for not giving controlling weight to a treating physician's opinion (See Wilson v. Commissioner of Social Security, 378 F.3d 541 (6th Circuit, 2004)).

**Under this framework, I do not afford Dr. McIntosh's opinion controlling weight.  Dr. McIntosh has not treated the claimant for the past year.  Further, his opinion is inconsistent with the treatment notes.  The claimant often was noted to have a normal gait, with only minimal swelling in his joints.  He does not need a cane to ambulate.  He can exercise regularly on a treadmill. The claimant has not reported any major issues using his hands and fingers in the treatment  notes.  These objective findings simply do not support such extreme standing, sitting, and walking limitations.  Further, while the claimant does have some pulmonary issues, the treatment has been sporadic and minimal, and his doctor has noted that these lung issues are generally controlled on medications. Dr. McIntosh's opinion is extreme, given the claimant's treatment notes and treatment course.  I afford it little weight.**

(Tr. 68-69) (emphasis added).

The ALJ formulated the following RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant cannot climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. The claimant can occasionally stoop, kneel, crouch, and crawl. He can frequently handle and finger bilaterally. He must avoid concentrated exposure to temperature extremes of hot and cold, and must avoid concentrated exposure to dusts, fumes, odors, etc. He must avoid workplace hazards such as unprotected heights or dangerous moving machinery. The claimant is limited to simple, routine tasks that do not involve directing the work of others or being responsible for the safety or welfare of others. He cannot perform piece rate work or assembly line work.

(Tr. 65.)

The Court finds the ALJ articulated "good reasons" for assigning only "little weight" to Dr. McIntosh's opinion. The ALJ discounted Dr. McIntosh's opinion, in part, because it was inconsistent with objective medical evidence and Hines' treatment notes. This reason is supported by substantial evidence. As the ALJ discussed earlier in the decision, Hines' physicians generally noted normal gait, normal coordination, normal range of motion in his joints and extremities, no edema, normal sensation, and no motor or sensory deficit. (Tr. 361-367, 479-481, 729-732, 727, 723, 749, 741, 792.) It is true that Hines frequently complained of joint pain and tenderness, and physical examinations sometimes noted tenderness, "minimal" swelling, and limited range of shoulder motion. However, with respect to his shoulder pain, the record reflects Hines reported improvement with physical therapy. (Tr. 749-750.) Moreover, in February 2016, Hines reported that his "pain was okay and generally controlled with Tramadol." (Tr. 796-797.) This is consistent with the fact that, beginning in June 2015, Hines' physicians noted his lupus was "steady," "generally doing well," and "stable with medication." (Tr. 725, 729, 739, 755, 762, 768.)

46

With respect to Hines' pulmonary condition, respiratory physical examination findings in May, June, August, September and November 2014 were normal.  (Tr. 362-363, 469-470, 473-476, 481, 607-608.)  Moreover, although Hines often complained of shortness of breath and breathing problems during this time period, he did not present to his pulmonologist until March 2015, after a nearly three year absence.  (Tr. 647-650.)  Pulmonary function testing in April 2015 showed small airways obstruction, but also revealed "no pulmonary limitation to exertion."  (Tr. 708, 709.)  As noted *supra*, when Hines  returned to Dr. Fuenning later that month, he reported medication had helped and his "breathing has not been too bad."  (Tr. 775.)  Respiratory examinations in June and November 2015, and January, February and March 2016, were normal. (Tr. 755, 729-732, 745-748, 743-744, 768, 739-742, 791-792.)  Indeed, in January and February 2016, Hines denied breathing problems, shortness of breath, and chest tightness.  (Tr. 743-744, 739-742.)  Between June 2015 and February 2016, Dr. Musa described Hines' interstitial lung disease as "stable and controlled on medication."  (Tr. 729, 745, 739.)

Moreover, as the Commissioner correctly notes, Dr. McIntosh's opinion is contradicted by the opinions of state agency physicians Drs. Manos and Klyop, both of whom concluded Hines could perform a reduced range of light work.  (Tr. 136-139, 154-157.)  The ALJ accorded "great weight" to Dr. Manos' and Dr. Klyop's opinions, noting they were "consistent with the claimant's treatment course, his regular exercise, the objective findings upon examination, and his diagnostic testing."  (Tr. 69-70.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ sufficiently articulated "good reasons" for discounting Dr. McIntosh's opinion and, further, that those reasons are supported by substantial evidence.

47

**Dr. Rosian**

On November 24, 2014, Dr. Rosian completed a "Lupus (SLE) Residual Functional Capacity Questionnaire." (Tr. 498-510.)  She noted she had treated Hines since June 2009, two to four times per year depending on the severity of his symptoms. (Tr. 498.)  When asked to identify clinical findings, symptoms, and objective signs of Hines' impairments, Dr. Rosian noted malar rash (over the cheeks); photosensitivity; non-erosive arthritis in his hands, feet, ankles, knees, fingers, and wrists (including swelling, warmth, and tenderness); positive ANA; severe fatigue; severe malaise; muscle weakness; and poor sleep. (Tr. 498-499.)  Dr. Rosian also identified shortness of breath and COPD. (Tr. 500.)  She characterized his prognosis as fair. (*Id*.)

Dr. Rosian assessed the following physical functional limitations:

- Hines' experience of symptoms was severe enough to often interfere with his attention and concentration;

- He could tolerate moderate work stress;

- He could walk one city block without rest;

- He could sit for 30 to 45 minutes at one time (e.g., before needing to get up, etc.) and for a total of less than 2 hours in an 8 hour workday;

- He could stand for 30 minutes at one time (e.g., before needing to sit down, walk around, etc.) and stand/walk for a total of less than 2 hours in an 8 hour workday;

- He would need a job that permits shifting positions at will from sitting, standing, or walking;

- He would need to take unscheduled breaks every 3 hours for 15 minutes before returning to work;

48

- He could lift and carry up to 20 pounds occasionally[16] but never 50 pounds;

- He could occasionally twist and stoop, but never crouch or climb ladders or stairs;

- He could engage in reaching, handling, and fingering with his bilateral hands for 5% of an 8 hour workday;

- He should avoid all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, and solvents/cleaners;

- He should avoid even moderate exposure to extreme cold, extreme heat, high humidity, and perfumes;

- He would be likely to be absent from work about four days per month as a result of his impairments or treatment.

(Tr. 501-503.)  Finally, Dr. Rosian stated that: "Due to [the] increased fatigue, joint pain and swelling he has been experiencing, it is difficult to determine how he could be dependable for full-time work."  (Tr. 504.)

The ALJ evaluated Dr. Rosian's opinion, as follows:

> The claimant's rheumatologist, Dr. Rochelle Rosian, filled out a form regarding the claimant's condition.  She noted that the claimant had non-erosive arthritis involving pain in two or more peripheral joints (Exhibit 7F/3), renal involvement, and a positive ANA test.  She listed his symptoms as severe fatigue, severe malaise, muscle weakness, and poor sleep (Exhibit 7F/4).  She opined his symptoms would often interfere with attention and concentration, but would be able to handle moderate levels of stress (Exhibit 7F/5).

> Dr. Rosian opined that the claimant could walk for 1city block without rest, sit for 30-45 minutes at a time, stand for 30 minutes at a time, and sit, stand, and walk all for less than 2 hours each in an 8-hour workday.  She opined that the claimant would need a job which would permit shifting positions at will, and would need to take breaks every three hours for 15 minutes (Exhibit 7F/6).  She did not find that he would need a cane to ambulate.  Dr. Rosian opined that the claimant could occasionally lift up to 20 pounds, occasionally twist and bend,

---

[16] The form defines the term "occasionally" as meaning 6% to 33% of an 8 hour workday. (Tr. 502.)

and never crouch, or climb ladders and stairs. She limited the claimant to only using his hands, fingers, and arms for 5% of the workday to reach, perform fine manipulation, and grasp and twist objects (Exhibit 7F/7).

Dr. Rosian also found several environmental limitations for the claimant. She opined the claimant would need to avoid moderate exposure to extreme cold, extreme heat, high humidity, and perfumes. She opined he would need to avoid all exposure to fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents, and cleaners. She concluded he would miss about four days of work per month (Exhibit 7F/8).

**I also do not afford Dr. Rosian's opinion controlling weight. Similar to Dr. McIntosh's opinion, it is extreme when compared to the actual treatment notes. The claimant rated his pain as 4/10 to her, she has noted only minimal swelling, and she most recently noted that his lupus labwork was good. She also characterized his lupus as "stable" in the treatment notes. Her extreme manipulative limitations are also note [sic] consistent with the treatment notes, during which the claimant did not report any major pain or swelling in his hands and fingers. Also, the pulmonary limitations are also inconsistent with the evidence, given that the claimant rarely even sees his pulmonologist, and his primary care doctor has noted that his lung issues are stable on medications. I afford Dr. Rosian's opinion little weight.**

(Tr. 69) (emphasis added).

The Court finds the ALJ articulated "good reasons" for assigning only "little weight" to Dr. Rosian's opinion. The ALJ discounted Dr. Rosian's opinion, in part, because it was "extreme when compared to the actual treatment notes." (*Id.*) This reason is supported by substantial evidence. As the ALJ correctly noted, when Hines presented to a nurse practitioner in Dr. Rosian's office in May 2014, he rated his joint pain a 4 on a scale of 10. (Tr. 361.) Examination revealed clear lungs, no wheezing, normal gait, normal pulses, normal skin (no suspicious rashes or lesions), and tenderness and "minimal swelling" in his MCP joints. (Tr. 362-363.) When Hines returned to Dr. Rosian in September 2014, he reported his "joints and energy are better." (Tr. 479.) Examination again revealed clear lungs, no wheezing, normal gait, normal sensation, normal pulses, normal skin (no suspicious rashes or lesions), and tenderness and "minimal

50

swelling" in his MCP joints.  (Tr. 481.)

Hines did not return to Dr. Rosian until June 2015, after a nine month absence.  (Tr. 753.)  At that time, he rated his pain a 3 on a scale of 10.  (Tr. 759.)  Examination revealed clear lungs, no wheezing, normal gait, normal sensation, and normal skin (no suspicious rashes or lesions).  (Tr. 755.)  Dr. Rosian also noted tenderness and "minimal" swelling in his MCP joints; no effusion, laxity or synovitis in his bilateral knees; and grinding and limited range of motion in Hines' left shoulder.  (*Id*.)  One week later, on June 9, 2015, Hines returned to Dr. Rosian and again rated his pain a 3 on a scale of 10.  (Tr. 765.)  Examination revealed clear lungs, swelling and tenderness in his hands and wrist, and tenderness and limited active range of motion in his left shoulder.  (Tr. 762.)  Dr. Rosian characterized Hines as "generally doing well" with his lupus, and administered a left shoulder injection.  (*Id*.)  The record reflects Hines continued to complain of left shoulder pain and was referred by Dr. Musa to physical therapy, which improved his pain.  (Tr. 749-750.)

Seven months later, in February 2016, Hines returned to Dr. Rosian and complained of an increase in pain, which he rated a 5 on a scale of 10.  (Tr. 767, 772.)  He reported medication had improved his pain and he had been "doing lots of work around the house and tried to lift weights," which aggravated his shoulder pain.  (Tr. 767.)  Examination again revealed clear lungs, swelling and tenderness in his hands and wrist, and tenderness and limited active range of motion in his left shoulder.  (Tr. 768.)  That same month, however, Hines presented to Dr. May and reported his joint pain was "okay and generally controlled with Tramadol."  (Tr. 796-797.)  During this time period, Hines' physicians (including Dr. Rosian) noted his lupus was "steady," "generally doing well," and "stable with medication.""  (Tr. 725, 729, 739, 755, 762, 768.)

51

In light of the above, the Court finds substantial evidence supports the ALJ's finding that Dr. Rosian's opinion of severe functional limitations is inconsistent with both her own treatment notes, and the medical evidence generally.  The ALJ acknowledged Hines suffered from joint pain and swelling, and noted that his physicians (including Dr. Rosian) often found tenderness, swelling, and limited range of motion in his joints.  However, the ALJ correctly noted that physical examination findings were not as severe as Dr. Rosian's functional limitations suggested.  Rather, and as discussed at length above, Hines' physicians often found normal gait, normal coordination, normal range of motion in his joints and extremities, no edema, normal sensation, and no motor or sensory deficit.  (Tr. 361-367, 479-481, 732, 727, 723, 749, 747, 741, 792.)  Moreover, even when joint pain and swelling was noted, Hines generally rated his pain between a 3 and 5 on a scale of 10, and Dr. Rosian most often characterized his joint swelling as "minimal."  Finally, with respect to Hines' pulmonary condition, the medical record supports the ALJ's finding that Hines' respiratory condition was stable and improved with medication.  As discussed at length *supra*, pulmonary function testing showed "no pulmonary limitation to exertion" and, with a few exceptions, respiratory examinations were largely normal.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ sufficiently articulated "good reasons" for discounting Dr. Rosian's opinion and, further, that those reasons are supported by substantial evidence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


                                                   _s/Jonathan D. Greenberg_____
                                                   Jonathan D. Greenberg
                                                   United States Magistrate Judge

Date: September 24, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**